UNITED STATES of America,
Plaintiff–Appellee,

v.

Charles Odell GHOLSTON,
Defendant–Appellant.

Nos. 92–4049, 92–4061.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 1, 1993.

Decided Nov. 23, 1993.

Rehearing and Suggestion for Rehearing
En Banc Denied Jan. 20, 1994.

Marilyn A. Bobula, Asst. U.S. Atty. (argued and briefed), Office of the U.S. Atty., Cleveland, OH, for plaintiff-appellee.

James R. Willis (argued and briefed), Willis, Blackwell & Rogers, Cleveland, OH, for defendant-appellant.

Before: MILBURN and GUY, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.

PER CURIAM.

Defendant, Charles Odell Gholston, was convicted of possession of crack cocaine with the intent to distribute. On appeal, Gholston raises the following allegations of error: (1) his right of confrontation, as well as the hearsay rule, were violated when evidence supplied by a non-testifying declarant was admitted as substantive proof; (2) he was denied due process when the prosecutor asked questions that presumed facts not in evidence, and no evidence was presented to substantiate the inquiry; (3) he was deprived of due process when the prosecutor became an unsworn witness against him; (4) the evidence underlying his conviction was insufficient; and (5) he was denied due process when the district court regarded the jury's verdict as conclusive as to the quantity of drugs involved and imposed sentence on that basis. We affirm.

## I.

On December 12, 1991, police detectives in Akron, Ohio, arrested Melvin Eckles and Robert Harshaw for trafficking in crack cocaine. Eckles decided to cooperate with the authorities by providing information concerning his supplier. Consequently, he was interviewed by Detectives Daniel Kovein and Michael Kelley the next day.

During this interview, Eckles identified his supplier as defendant, Charles Gholston, a/k/a Kevin Davis. Eckles gave a physical description of Gholston, a description of his

automobile (a maroon Toyota Camry, with Pennsylvania license plates), a description of the leather coat that he habitually wore, and the location of an apartment on Tallmadge Avenue in Akron where he might be found.

That day, Detective Jimmy Tomsho was dispatched to the area of the Tallmadge Avenue apartment to gather information for a search warrant and to look for Gholston. While there, he observed Gholston wearing the coat Eckles had described and then driving off in a maroon Toyota with Pennsylvania license plates. Tomsho followed him and radioed the police dispatcher.

Other officers, including Kelley and Patrolman John Lewis, soon followed in pursuit. Lewis, in a marked police cruiser, tried to detain Gholston when he was stopped at an exit ramp off the expressway. Gholston tried to drive away from Lewis, but he was blocked in by Kelley's car.

Gholston was arrested carrying a Michigan driver's license in the name of "Kevin Davis." He also had on his person a number of keys hooked together on a chain and $181 in cash.

Gholston was transported to the detective bureau and advised of his rights. When asked his name, he claimed that he was Kevin Davis and denied being Charles Gholston. When told he was observed exiting apartment 5-B at the Tallmadge Avenue address, he asserted that he was at 7-B, a female's apartment, whose name he could not remember. He insisted that he never had been inside apartment 5-B.

The police later learned that Steve Gruich was the owner of the Tallmadge Avenue apartments. At Gholston's trial, Gruich testified that he had rented apartment 5-B to a woman named Sandra, who moved out without paying rent for November and December 1991. According to Gruich, during the first week of December, a man named Kevin called him and volunteered to pay the two months' rent, which he did. Kevin wanted to take over the apartment, and Gruich let him in that night. Gruich saw Kevin at the apartment a few days later; he did not need a key to get in at that time.

The police obtained a county search warrant for the apartment, which they executed on December 13, 1991. They discovered that one of the keys on Gholston's chain opened the apartment and another key opened a locked fire safe found in the closet on the second floor of the apartment. Inside the safe was a plastic bag containing 1.19 grams of crack cocaine. The police also recovered an electronic plumb scale on the second floor between the bathroom and the bedroom; a triple-beam gram scale and straight-edge razor blades with cocaine residue in the bathroom; another razor blade inside the kitchen cupboard; and, on the counter near the stove, a plate and a baby food jar with cocaine residue. There was only men's clothing in the apartment; no women's clothing was found.

The detectives discussed the results of the search with Eckles, who was still in custody. He gave them a more detailed description of Gholston's hiding places. Accordingly, the detectives obtained a second search warrant for the apartment, which also was executed on December 13, 1991.

This time, the police recovered three more plastic bags containing a total of 25.5 grams of crack cocaine. They had been wrapped in a paper McDonald's bag and were found in a closet on the first floor. From under a stove drawer, the police uncovered a blue canvas bag, which had a lock attached to it. A key from Gholston's key chain opened the bag, which had five plastic bags containing a total of 39 grams of crack cocaine. The bags of cocaine found during this search of the apartment were wrapped and tied in a manner identical to the bag found in the safe as part of the initial search. Additionally, under a mattress in the bedroom, the police recovered a loaded .357 caliber revolver.

On February 20, 1992, a federal grand jury returned a three-count indictment charging Gholston with one count of possession of cocaine with the intent to distribute the drug (21 U.S.C. §§ 841(a)(1) and 8(b)(1)(A)), one count of possession of a firearm after having been convicted of a felony (18 U.S.C. §§ 922(g)(1) and 924(a)(2)), and one count of possession of a firearm while under a felony indictment (18 U.S.C. §§ 922(n) and 924(a)(1)(D)).

At trial, the parties stipulated that all of the seized substances were, in fact, crack cocaine, and also stipulated as to the amount of the drugs. In addition, the parties stipulated the revolver had moved in interstate commerce, because it was manufactured in Connecticut and ultimately was recovered in Ohio. Finally, they stipulated that Gholston had been convicted of a felony in Michigan on December 31, 1987, and also that he had been indicted on felony charges in Pennsylvania on May 21, 1991.

Eckles ultimately was released from custody. He disappeared and could not be found to testify at Gholston's trial. Harshaw, however, remained in custody and offered testimony pursuant to a subpoena.

Harshaw stated that he had been friends with Eckles for about three years and with Gholston for a year and a half. He admitted that he had sold drugs with Eckles "off and on" for about three years. In Akron, they sold crack cocaine from three locations, two houses and an apartment, paying the residents in cash or in drugs for the use of the premises. They stored their drugs at the apartment on Tallmadge linked to Gholston. As far as Harshaw knew, Gholston had a key to the apartment.

During the month of December 1991, Harshaw personally observed Gholston in the apartment three times. He never saw a woman named "Sandy" there.

Harshaw admitted that he and Eckles stored drugs in the Tallmadge Avenue apartment in the first floor closet, in a hole above the doorway, in a McDonald's bag. He denied, however, that they ever kept drugs in a safe or in a blue canvass bag. He denied ever seeing any such bag. Harshaw testified that the safe belonged to Eckles and that he believed that Eckles had a key to it, although he could not say for certain. He never witnessed Eckles opening the safe.

Harshaw also admitted making statements during interviews with the authorities that were inconsistent with his trial testimony. On two separate occasions, he told law enforcement officials that Gholston visited the three locations where he was selling drugs approximately two to three times a week. At Gholston's trial, however, he claimed that his earlier statements were false. Similarly, he twice told the authorities that Gholston had a .357 caliber revolver. Again, in open court, he asserted that those statements were false. He also had stated to the authorities that the safe belonged to Gholston; at Gholston's trial, he testified that it belonged to Eckles.

Significantly, Harshaw testified that he had maintained contact with Gholston by letter since Gholston's arrest, and that they had discussed Gholston's case. Harshaw "probably" referred to Eckles as a "snitch" and "probably" complained to Gholston about Eckles' cooperation with the authorities. On March 23, 1992, after his two interviews with law enforcement officials, Harshaw wrote to Gholston: "I told them that I never received anything from you and I never saw any transactions between you and Mel [Eckles], and I told them that I only seen you in Ohio about four times during that—this period. I tried as best as possible to put everything on Mel."

Referring to his own cooperation with the authorities, Harshaw wrote:

> I'm writing this letter to let you know what happened. I can't expect you to be happy, but I expect you to be able to understand that I didn't have a choice. With that nigga [Eckles] hanging over my head with the testimony, there was no way I could bluff about taking my shit to trial. That's why I wrote this letter, to let you know that without my testimony they can't use shit against you. I had to tell them I would testify if needed. And that can go two ways; either I can say I lied because they were hanging me to tell on you so I did, but it was all lies and the shit I told them didn't involve you at all, or I could just refuse to testify at all, but that will depend on you and your lawyer.

Harshaw added this encouragement to Gholston: "I ain't going to testify against. If anything, I'm going to testify for you."

At first, Harshaw did not remember writing this letter, although he acknowledged that it was in his handwriting. He then agreed that, although he could not recall what he wrote, he was trying to be truthful in the letter.

Gholston was convicted on the drug distribution count, but not on the two firearms counts. He subsequently was sentenced to 240 months' imprisonment, to be followed by 120 months of supervised release.

## II.

▌ Gholston argues that his right of confrontation, as well as the hearsay rule, were violated when statements supplied by Melvin Eckles were admitted. Gholston contends that certain statements attributed to Eckles should not have been allowed into evidence as proof of the matters asserted within them, as they were made by a non-testifying declarant, and did not fall within any of the hearsay exceptions set out in Rules 803 and 804 of the Federal Rules of Evidence.

We have examined the testimony that Gholston alleges was hearsay. None of it involved out-of-court declarations on Eckles' part. Rather, the portions of the record he cites comprised part of the testimony of Detectives Daniel Kovein and Jimmy Tomsho. They were asked by the prosecutor how they came to investigate Gholston, and they referred to the information that Eckles had given them. They did not, however, repeat any actual declarations made by Eckles. Furthermore, their Eckles-related testimony was not offered as proof of the matters asserted within it. The detectives were simply asked to explain the background of the case and the reasons for their various actions. Accordingly, we detect no hearsay problem.[1]

## III.

Gholston next contends that due process was denied when the prosecutor asked questions that presumed facts not in evidence, where no evidence was presented to substantiate the inquiry.

Gholston calls our attention to four in-court exchanges in which Robert Harshaw was asked by the prosecutor about state-ments he allegedly made when he was interviewed by law enforcement officers on December 12, 1991, and on February 26, 1992. On the stand, Harshaw denied that he previously had told the authorities that he sold drugs for Gholston, or received drugs from him.

In view of Harshaw's denials, Gholston argues that the government was obligated, as part of its attempt to impeach Harshaw by way of prior inconsistent statements, to offer evidence that justified the inquiries.

Rule 613(a) of the Federal Rules of Evidence (Prior Statements of Witnesses—Examining witnesses concerning prior statement) provides that:

> In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

▌ There is no requirement under Rule 613 that a party who seeks to impeach a witness through alleged prior inconsistent statements must present extrinsic evidence to "support" the impeachment attempt. However, certain safeguards exist to alleviate the danger that an impeaching party might act in bad faith by alluding to statements that were never made.

▌ First of all, the district court, through an exercise of its trial management powers, can control the impeaching party's line of questioning. In the instant case, Gholston did not object to most of the questions at issue.[2]

Additionally, the non-impeaching party (here, Gholston) often will have the opportunity to examine persons who allegedly heard the prior statement. Here, one of the officers who conducted the interviews of Harshaw testified and was available for questioning.

---

1. We also note that no objections were made to the relevant portions of Detective Kovein's and Detective Tomsho's testimony. Thus, defendant has the burden of showing that the admission of the challenged statements was "plain error."

2. We therefore must assess the bulk of what transpired below according to the "plain error" standard. *See* Rule 52 of the Federal Rules of Criminal Procedure.

Further, if extrinsic evidence of an allegedly inconsistent statement is not forthcoming, the non-impeaching party can highlight this fact in his or her closing argument. Gholston chose not to do this in the instant case.

■ Finally, the district court, as it did here, should instruct the jury that statements by counsel, including assertions of fact, are not to be considered evidence.

After reviewing the record, we are convinced that the prosecutor did not act in bad faith in attempting to impeach Harshaw in the manner that she did. We are further persuaded that no error was committed.

### IV.

Gholston next argues that he was denied due process when, in his view, the prosecutor became an unsworn witness against him.

Gholston claims that this occurred when the prosecutor asked Robert Harshaw about a conversation he and his attorney had with the prosecutor and three law enforcement officers the previous evening:

Q. And do you recall being interviewed by me last night by telephone with your attorney on a conference phone? . . . .

Do you remember that interview last night?

A. Yes. Yes, I do.

Q. Okay. Do you recall telling us last night that Charles Gholston knew that hiding place in the apartment for those drugs?

MR. LILLIE: Objection.

THE COURT: He may answer if that's what he told them last night.

A. No. I don't recall saying that.

BY MS. BOBULA:

Q. You don't remember, or you deny it?

A. I don't remember saying that.

Gholston suggests that "the unmistakable tenor, if not the actually intended thrust, of these questions was the prosecutor was literally telling the jury that the witness had in fact made the statements here being centralized to her." (Defendant's Brief at 34).

■ A prosecutor must take care not to unduly inject himself or herself into the proceedings. However, nothing of the sort happened here. Harshaw was asked an appropriate question and his answer was evasive, or at least unclear. The prosecutor then asked him to clarify his response. No objection was made to the prosecutor's follow-up question. Accordingly, we find nothing improper about the exchange that Gholston cites.

### V.

Gholston also contends that the evidence underlying his conviction was insufficient. He bases his argument, in part, on his assertion that certain statements attributed to Melvin Eckles should not have been presented to the jury. We already have rejected Gholston's argument in this regard.

■ The test for determining whether a conviction is supported by sufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ellzey,* 874 F.2d 324, 328 (6th Cir.1989) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). The standard is the same regardless of whether the evidence presented is direct or circumstantial. *United States v. Gallo,* 763 F.2d 1504, 1518 (6th Cir.1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1200, 89 L.Ed.2d 314 (1986). In addition, the reviewing court must "resolve all inferences which may reasonably be drawn from the evidence in the government's favor and resolve all conflicts in the testimony in the same way." *United States v. Tilton,* 714 F.2d 642, 645 (6th Cir.1983) (citing *United States v. Wolfenbarger,* 426 F.2d 992 (6th Cir.1970)).

■ When Gholston was arrested following his unsuccessful attempt to elude capture, he had a key to the apartment where the drugs were found. Steve Gruich's testimony established that Gholston, operating under an alias, paid rent on the apartment. Robert Harshaw's testimony also confirmed his presence in and use of the premises. Additionally, Detective Jimmy Tomsho observed Gholston leaving the apartment com-

plex on the day that the search warrants were executed. Hence, Gholston plainly had possession of the apartment and dominion over its contents.

Indeed, Gholston had a key to the safe in which 1.19 grams of crack cocaine were found, as well as a key to the blue canvas bag in which 39 grams of crack cocaine were discovered. Harshaw stated that neither he nor Eckles owned such a bag. The drugs in the blue bag were found on the same floor as were an additional 25.5 grams of crack cocaine in a McDonald's bag. Given his access to the drugs in the McDonald's bag, the jury could have inferred that Gholston also possessed them with the intent to distribute. Scales and materials commonly used to package narcotics were found throughout the apartment. Gholston's contention therefore is without merit.

Finally, Gholston asserts that, while the indictment charged that he possessed more than 50 grams of crack cocaine with the intent to distribute, the district court should not have automatically factored this into its sentencing formula. He claims that the evidence presented at trial did not establish that he possessed the total amount of the drugs recovered by the police.

A district court's determination regarding the quantity of drugs for which a defendant will be held accountable "is a finding of fact which must be accepted by a court of appeals unless clearly erroneous." *United States v. Walton*, 908 F.2d 1289, 1300–01 (6th Cir.), *cert. denied*, 498 U.S. 990, 111 S.Ct. 532, 112 L.Ed.2d 542 (1990). As we have indicated, evidence was introduced connecting Gholston with well over 60 grams of crack cocaine. In light of such evidence, we cannot say that the district court's conclusion as to drug quantity was clearly erroneous.

**AFFIRMED.**