RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0230P (6th Cir.)
File Name: 04a0230p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

No. 02-3859

DERRICK L. FOSTER,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 01-00183—Solomon Oliver, Jr., District Judge.

Argued: March 12, 2004

Decided and Filed: July 20, 2004

Before: NELSON, MOORE, and FRIEDMAN, Circuit
Judges.[*]

———————

### COUNSEL

**ARGUED:** Robert A. Dixon, Cleveland, Ohio, for
Appellant. Joseph P. Schmitz, ASSISTANT UNITED

———————

[*] Daniel M. Friedman, Circuit Judge of the United States Court of
Appeals for the Federal Circuit, sitting by designation.

STATES ATTORNEY, Cleveland, Ohio, for Appellee.
**ON BRIEF:** Robert A. Dixon, Cleveland, Ohio, for
Appellant. Joseph P. Schmitz, ASSISTANT UNITED
STATES ATTORNEY, Cleveland, Ohio, for Appellee.

———————

### OPINION

———————

KAREN NELSON MOORE, Circuit Judge. Defendant-
Appellant Derrick L. Foster ("Foster") appeals his convictions
for unlawful possession of a firearm and possession with
intent to distribute phencyclidine ("PCP"). After approaching
Foster to ask him some questions, the police detected the
smell of PCP coming from his person. The officers
proceeded to conduct an investigative stop of Foster, which
led to the discovery of marijuana, PCP, and a handgun.
Foster was arrested, and after a jury trial, convicted. He raises
three issues on appeal: (1) the district court erred when it
denied his motion to suppress evidence used at trial to convict
him; (2) the district court erred when it admitted "other acts"
evidence in violation of the Fifth and Fourteenth
Amendments by allowing the impeachment of a defense
witness by the government; and (3) Foster's trial counsel
provided ineffective assistance of counsel in violation of the
Sixth Amendment. We **AFFIRM** the district court's denial
of Foster's motion to suppress, as well as its decision to
permit impeachment of the defense witness by the
government. We do not address the ineffective-assistance-of-
counsel claim because the record is inadequate for appellate
review.

### I. BACKGROUND

On December 13, 2000, Cleveland Police officer Timothy
Higgins ("Higgins"), along with fellow officers Baker
("Baker") and Hupka ("Hupka"), was on foot patrol in the
area of 9310 Amesbury Avenue, in which there was a

residential apartment complex. Higgins belonged to the Fifth District, Fresh Start Unit, which "is a unit that answers and responds to quality of life issues" like "drug activity, loud music, drinking and gambling." Joint Appendix ("J.A.") at 60-61 (Suppression Tr.). Higgins had been in this particular area of Cleveland many times before in response to complaints of drug activity. Those past visits had involved an estimated eighty-five arrests for PCP in that particular apartment complex. On December 13, Higgins was responding to a complaint that had been logged at the end of November 2000. The complaint failed to identify any particular individuals.

Higgins testified that at around 5:00 pm that day, he and other members of his team observed Foster emerge from a parked vehicle that was still running.[1] The subject walked towards a dumpster surrounded by a brick enclosure. The officers walked towards the dumpster area because in their "experience . . . sometimes [drug traffickers] hide PCP in the Dumpster area." J.A. at 66 (Suppression Tr.). Foster then walked away from the dumpster area and approached the officers. Higgins testified that as soon as he was face to face with Foster, he could smell PCP coming from Foster's person. Baker, who was acting as Higgins's cover officer while Higgins made contact with Foster, also noticed a strong odor of PCP coming from Foster. Higgins proceeded to ask Foster his name, what he was doing there, and whether he had any identification on him. Foster replied that he was looking for a cell phone in the dumpster[2] and said he did not have any identification on his person. Higgins said Foster appeared nervous throughout this encounter.

About a minute into the conversation, Foster indicated that he wanted to return to his vehicle.[3] Foster contests this statement, claiming that he disavowed ownership of the vehicle. At this time, Higgins handcuffed Foster and conducted a pat-down of Foster's person for weapons. Higgins said he did this because in his experience, people under the influence of PCP had the tendency to become violent, so he wanted to ensure that Foster was not armed. Asked what his plan of action was, Higgins said that he "identified the smell, and [Foster] couldn't identify who he was." J.A. at 76 (Suppression Tr.). "I wanted to find out exactly who he was, and with his nervousness, the smell, the nervousness, and he's unable to identify who he was, I wasn't sure if he was hiding from a warrant, or what exactly was going [on] at this time, so I needed to investigate a little bit further to find out —." J.A. at 76 (Suppression Tr.). Higgins then heeded Foster's request, as it was cold out and Foster was wearing only a tee shirt despite the December weather, and went to place Foster in the subject's car for a period until the officers could get to their car, which was parked several blocks away. Up until this point, Higgins had never told Foster that the latter was under arrest. Instead, Higgins told Foster that "[Higgins was] going to check out who [Foster] was and that [Higgins] needed to handcuff [Foster] to make sure there weren't any weapons that he could access." J.A. at 81 (Suppression Tr.).

When Higgins opened the driver's side door of Foster's car, he was instantly hit with the smell of marijuana.[4] Higgins

---

[1] Officer Baker testified that he never saw Foster emerge from the vehicle.

[2] Foster's ex-girlfriend, Bridgette Glover, testified that she had thrown his cell phone into the dumpster that day because she was mad at Foster, and that is why he was out looking in and around the dumpster.

---

[3] Baker testified at the suppression hearing that Foster made this request because he was cold.

[4] At trial, Higgins said he detected "fresh" marijuana. J.A. at 128 (Trial Tr.). However, at the suppression hearing, he simply said he detected the smell of marijuana. Baker, when testifying at the suppression hearing, described the smell as "burnt marijuana coming from the vehicle." J.A. at 103 (Suppression Tr.). However, he claimed to have detected the smell as the group approached Foster's car and said it was

then asked Foster if there was marijuana in the car, to which Foster responded that there was some, and that it was located in the console on the floor. As Higgins leaned into the vehicle to retrieve the marijuana, he noticed a gun under the driver's seat. Higgins picked up the gun and removed the magazine from the gun along with a live round. The live round fell on to the seat of the car, and as Higgins went to pick it up, he saw two vials of PCP and an eye dropper between the seat and the door of the vehicle. It was at this time that Foster was arrested and administered *Miranda* warnings.[5] A subsequent search of Foster's person revealed $751 in cash.

On April 18, 2001, an Indictment was issued charging Foster with two counts of criminal activity. Count One charged Foster with violation of 18 U.S.C. § 922(g)(1), which makes it unlawful for a person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm . . . ." 18 U.S.C. § 922(g)(1). Count Two charged Foster with violation of 21 U.S.C. § 841(a)(1), possession with intent to distribute PCP. Foster filed a motion to suppress the evidence found in his car, claiming he had been the victim of an illegal search and seizure. An evidentiary hearing was held on December 5, 2001, and on January 23, 2002, the court issued an order denying the motion. After a jury trial, Foster was found guilty as charged and on July 23, 2002, was sentenced to two hundred and sixty-two months' imprisonment. Foster then filed this timely appeal.

---

coming from the vehicle's window, which was slightly "cracked."

[5] Baker testified that Foster was arrested after the gun was found and before the vials of PCP were detected. A search subsequent to the arrest uncovered the PCP, according to Baker.

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

### A. Motion to Suppress

#### 1. Standard of Review

"When reviewing the denial of a motion to suppress, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000) (citing *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)). With regard to *Terry*-stop analysis in particular, "[a]lthough the standard of review on the ultimate reasonable suspicion inquiry is *de novo*, the district court is at an institutional advantage, having observed the testimony of the witnesses and understanding local conditions, in making this determination. Accordingly, 'due weight' should be given to the inferences drawn from the facts by 'resident judges.'" *United States v. Townsend*, 305 F.3d 537, 542 (6th Cir. 2002) (quoting *Ornelas v. United States*, 517 U.S. 690, 698 (1996)). Finally, the evidence must be reviewed "in the light most likely to support the district court's decision." *Navarro-Camacho*, 186 F.3d at 705 (quoting *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994)).

#### 2. Factual Disputes

Foster begins by claiming that the district court committed clear error with regard to two factual findings. Specifically, Foster alleges that although Higgins testified that he saw Foster emerge from the vehicle, Baker testified that he never saw Foster come out of the car in question. This is relevant because Foster later denied ownership of the vehicle and its contents. The second allegation of fact-finding error concerns conflicting testimony of Higgins and Baker regarding the

smell of the marijuana coming from Foster's car, and the time during the encounter with Foster that each officer smelled it. Higgins testified at trial that he smelled fresh marijuana when he opened the car door, while Baker testified at the suppression hearing that he smelled burnt marijuana coming from the "cracked" window as he walked over to the car.

"A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Navarro-Camacho*, 186 F.3d at 705. Furthermore, as stated above, the evidence must be viewed on appeal "in the light most likely to support the district court's decision." *Id.* (quotation omitted).

Under this standard of review, we cannot say that the district court clearly erred. Regarding the conflicting descriptions concerning the timing at which the officers smelled the marijuana, the district court noted this inconsistency. However, it seems clear from the district court's decision that it, quite appropriately, did not believe that this discrepancy made any difference to the fact that marijuana was detected in Foster's vehicle, thereby providing the officers with probable cause to search the vehicle. As regards the different descriptions of the smell of the marijuana, this conflict stems from comparing testimony provided by Baker at the suppression hearing with testimony given by Higgins at the trial. At the suppression hearing Higgins testified to smelling marijuana, without specifying whether it was fresh or burnt. Even if we were to consider the trial testimony, we do not see any significant conflict that would alter the outcome, for in any event, marijuana was detected as emanating from Foster's car and was ultimately discovered in it. Whether it was burnt or fresh-smelling marijuana does not change this.

As for the testimony of Higgins that he saw Foster exit the vehicle, while Baker testified that he did not, the district court

was entitled to credit the testimony of Higgins that he saw Foster exit the vehicle. After all, the district court is "in the best position to judge credibility," *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996), and "this court accords great deference to such credibility determinations." *Navarro-Camacho*, 186 F.3d at 705. Higgins's testimony, while different from Baker's, does not necessarily even conflict with Baker's, for each officer reported from his own perspective. Accordingly, the district court did not clearly err.

### 3. The Initial Encounter

Foster asserts that the police violated the Fourth Amendment during their initial encounter with him. "'[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen.'" *Illinois v. Lidster*, 124 S. Ct. 885, 890 (2004) (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). "[P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation." *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 216 (1984). A consensual encounter can ripen into a seizure if "in light of all the circumstances, [] 'a reasonable person [would] have believed that he or she was not free to walk away.'" *United States v. Grant*, 920 F.2d 376, 382 (6th Cir. 1990) (quoting *United States v. Saperstein*, 723 F.2d 1221, 1225 (6th Cir. 1983)).

Higgins's initial contact with Foster failed to rise to the level of a Fourth Amendment violation. When Higgins first addressed Foster, Higgins asked Foster his name, what he was doing there, and whether he had any identification on him. This is permitted under Fourth Amendment precedent. *See Hiibel v. Sixth Judicial Dist. Ct. of Nev.*, 124 S. Ct. 2451, 2458 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth

Amendment."). Therefore, at this point in the encounter, Higgins's actions towards Foster were lawful.

### 4. The *Terry* Stop

Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), "where a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances." *United States v. Bentley*, 29 F.3d 1073, 1075 (6th Cir. 1994). *United States v. Hurst* accurately summarizes the relevant law:

> [A]n investigative detention is permissible when it is based upon "specific and articulable facts which, taken together with rational inferences from those facts," give rise to a reasonable suspicion that the individual is, was, or is about to be engaged in criminal activity . . . . In reviewing a challenged investigative stop, "the totality of the circumstances — the whole picture — must be taken into account." . . . Furthermore, "[i]n assessing the reasonableness of the stop, the facts are 'judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?'"

228 F.3d at 757 (quotations omitted).

An officer who decides to conduct a *Terry* stop must be acting on more than his or her "inchoate and unparticularized suspicion or 'hunch,' but [on] the specific reasonable inferences which he is entitled to draw from the facts *in light of his experience*." *Terry*, 392 U.S. at 27 (emphasis added). "That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "[A] pattern of suspicious behavior need only be recognizable by one 'versed in the field of law enforcement.'" *United States v. Knox*, 839

F.2d 285, 290 (6th Cir. 1988) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). Additionally, the authority to conduct a *Terry* stop is "narrowly drawn" so as to "permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27. Finally, "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

The district court concluded that the officers had reasonable suspicion to justify a *Terry* stop. Based on the factors known to the officers at the time — that Foster smelled strongly of PCP, that he appeared nervous, that the area they were in was notorious for heavy drug trafficking, and that Higgins knew that drug traffickers would hide PCP in or near the apartment complex dumpsters — the court concluded that all of this "amount[ed] to reasonable suspicion such that the scope of the initial stop could properly be expanded." J.A. at 55. The court also noted that the length of Foster's detention did not exceed the bounds of reasonableness, as the encounter lasted no more than four minutes.

Foster argues that the officers lacked the reasonable suspicion necessary to justify a *Terry* stop. He asserts that by the officers' own testimony, they "indicated that they handcuffed Mr. Foster <u>before</u> conducting the supposed <u>Terry</u> pat-down. When that procedure yielded no weapons or contraband, police continued to keep him handcuffed. Clearly he was under arrest from the moment that he was handcuffed." Appellant's Br. at 16-17. Foster further argues that as he was arrested from the outset of the confrontation with the officers, and the arrest lacked probable cause, it was illegal, and therefore "[a]ny evidence gained as a result of that

illegal arrest should have been suppressed as 'fruit of the poisonous tree.'" Appellant's Br. at 17. The government, on the other hand, argues that the district court's conclusion that the officers had reasonable suspicion sufficient to justify a *Terry* stop was correct and should be upheld.

We conclude that the district court did not err in determining that the *Terry* stop was based on a reasonable suspicion that Foster was engaged in criminal activity. Specifically, we emphasize that the officers' detection of the odor of PCP emanating from Foster's person gave the officers the authority to detain Foster temporarily to determine his identity, confirm that he was capable of driving his vehicle, and more importantly, either confirm or dispel their initial inclination that Foster was under the influence of PCP.[6] Because a *Terry* stop is justified "by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity," *Cortez*, 449 U.S. at 417, the fact that Foster smelled of PCP, an illegal substance, alone warrants the officers detaining him to investigate the situation further.[7] Moreover, because an officer may conduct a *Terry*

---

[6] Foster argues that pursuant to *United States v. Wood*, 106 F.3d 942 (10th Cir. 1997), nervousness is a factor of limited significance because many individuals will display it when having an encounter with police. *Id.* at 948. For purposes of this decision we need not consider Foster's nervousness or the assertion that this was a known drug area as factors warranting inclusion in the *Terry*-stop calculus.

[7] Foster asserts that the officers never claimed that "they feared for their safety such as to justify a <u>Terry</u> pat-down." Appellant's Br. at 19. However, the law does not require that the officers affirmatively state in advance that they are fearful that the suspect is armed in order to legitimize a *Terry* stop. Rather, an officer is permitted to conduct "a reasonable search for weapons for [his or her] protection . . . , where he [or she] has reason to believe that he [or she] is dealing with an armed and dangerous individual." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Here, Higgins testified that previous dealings with people under the influence of PCP led him to feel that Foster posed a potential threat of violence, thereby warranting a pat-down for any concealed weapons.

stop based on the reasonable inferences he may draw "in light of his experience," *Terry*, 392 U.S. at 27, Higgins's eighty-five previous PCP-related arrests in that particular apartment complex are relevant experiences.

Foster argues that once the police conducted a pat-down of his person, "any suspicion so as to justify further intrusion was eviscerated." Appellant's Br. at 21. However, the police were still entitled to determine whether he was indeed under the influence of PCP, and the pat-down for weapons in no way either confirmed or dispelled that suspicion. As stressed in *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984), a *Terry* stop permits law enforcement to "detain [a] person briefly in order to 'investigate the *circumstances that provoke suspicion*.'" *Id.* (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975)) (emphasis added). Hence, patting down the subject of a *Terry* stop does not signal the end of the detention, for law enforcement is permitted to investigate the circumstances that led them to stop the individual. A pat-down for weapons is only part of the detention. "[W]hen a law enforcement officer no longer has any reasonable suspicion of criminal activity, the detained individual is constitutionally free to leave." *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998) (en banc). Clearly, the pat-down did not end Higgins's reasonable suspicion of Foster. "To have simply sent [Foster] on his way, without brief further questioning at the very least, would have been plainly unreasonable, even inept, police work." *Id.*

As for the fact that Foster was handcuffed during the detention, according to Higgins's testimony, this was done only after Foster asked to return to his vehicle. On this point, Higgins testified that "[his] initial reasoning for going to the car was the elements and it was cold out." J.A. at 91 (Suppression Tr.). Higgins also testified that in his experience, people under the influence of PCP can become violent, and therefore he wanted to ensure that Foster was not armed. Therefore, he handcuffed Foster and conducted a protective pat-down of his person, and then subsequently

placed him in his car until the closest patrol car, which was several blocks away, arrived.[8]

*Terry* spoke to this very situation:

> When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Terry*, 392 U.S. at 24. In *Terry*, the officer had reasonable suspicion that the subjects he was observing were armed and dangerous. *Id.* In the present situation, Higgins had reason to think that Foster could be dangerous, based on his experience in dealing with people under the influence of PCP. As in *Terry*, "the record evidences the tempered act of a policeman who in the course of an investigation had to make a quick decision as to how to protect himself and others from possible danger, and took limited steps to do so." *Id.* at 28. The Supreme Court has repeatedly stressed that "it is unreasonable to prevent the police from taking reasonable steps to protect their safety," and that in so doing, they should not have to "decide instantaneously what 'less intrusive' alternative exists to ensure that any threat presented by the suspect will be neutralized." *Michigan v. Long*, 463 U.S. 1032, 1052 n.16 (1983).

We do not believe that Higgins overstepped the permissible bounds of the *Terry* doctrine by handcuffing Foster. First, it was Foster who made the request to be returned to his vehicle

---

because he was cold.[9] Higgins, considering this and knowing that people on PCP can become extremely violent, handcuffed Foster not only to conduct the pat-down but also to be able to place Foster in his car and out of the cold, without having to worry about the possible weapons in Foster's car that he could reach. Second, in light of the situation, it appears that Higgins made a quick call in a threatening situation, to ensure the safety not only of himself but also his fellow officers. This Circuit has stated that it is inappropriate, "in the quietude of our chambers, to second-guess standard police procedure and [] on-the-scene judgment." *United States v. Bradshaw*, 102 F.3d 204, 212 n.19. In addition, as regards the use of the handcuffs specifically, this Circuit has previously held that "the use of handcuffs [does not] exceed the bounds of a *Terry* stop, so long as the circumstances warrant that precaution." *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999). In this case, it seems reasonable that Higgins believed that handcuffing Foster was the only way to secure the situation. Accordingly, the district court did not err when it concluded that this was a legitimate *Terry* stop.

### 5. The Search of Foster's Vehicle

Finally, Foster argues that because he was illegally arrested, the subsequent search of his vehicle was unlawful. However, as established above, Foster's detention was not an arrest, but was a valid and lawful *Terry* stop. Accordingly, when the officers detected the smell of marijuana coming from Foster's vehicle, this provided them with probable cause to search the vehicle without a search warrant. *See United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993); *see also United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002). This therefore

---

[8]Higgins said that Foster was placed in his own vehicle only until they could get a police car to the location.

[9]It cannot be said that Foster was arrested when he was placed in his own vehicle, especially in light of the fact that "detention in a police cruiser does not automatically transform a *Terry* stop into an arrest." *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999).

turned a lawful *Terry* stop into a lawful search. As a result, because the officers had probable cause to search the vehicle, the marijuana, gun, and PCP recovered from the car were all properly admissible against the defendant. Accordingly, the district court was correct when it denied Foster's motion to suppress.

## B. Admission of Witness's Inconsistent Statement

"A district court's decision regarding the admission of evidence is reviewed for abuse of discretion." *Gibson v. United States*, 271 F.3d 247, 254 (6th Cir. 2001). At trial, the defense called Bridgette Glover ("Glover"), Foster's ex-girlfriend, to testify about the events surrounding Foster's arrest, as she claimed to have witnessed them. She testified on direct examination that Foster was moving his things out of her apartment on the day of his arrest, as they had just ended their relationship. She further testified that she and her son helped Foster search for his cellular phone in the dumpster. When asked when she had last seen Foster driving the vehicle involved in the incident, she testified that she had not seen him driving it on the night in question, and that the last time she had seen him in it was on November 26, 2000. On cross-examination, Glover was asked about her testimony regarding the search for the phone and the car and was then impeached by a prior inconsistent statement she had made to police on January 4, 2001. In the prior statement, she said that she did not help Foster look for a cellular phone in the dumpster, and that she saw Foster driving the vehicle on the night of his arrest.

Glover was then asked if she had ever witnessed or had personal knowledge of Foster selling PCP. The defense objected, initially asserting that it was hearsay evidence, later adding a "404(b) basis for it." J.A. at 185 (Trial Tr.). Specifically, defense counsel stated: "[I]f she knew he sold it a year ago, that would be in the nature of 404(b) evidence, would it not? It's not connected in time to this possession on

this date. I just think it's highly prejudicial." J.A. at 185 (Trial Tr.). The following exchange took place:

| | |
|---|---|
| Court: | What about the 404(b)? It seems to me that's the only issue, because otherwise, if she knew something about it firsthand — |
| Defense: | Well — |
| Court: | — she could testify about it. |
| Defense: | If they get by the first — |
| Court: | But 404(b) — |
| Defense: | — prong. |
| Prosecution: | Well, your honor, I think that I would ask the Court to rule it is admissible. I think the probative value of this evidence, assuming it is forthcoming, is extremely high. We have a defendant here who is contesting — |
| Court: | I don't mean 403. I mean 404(b). The government is supposed to give notice generally with regards to — |
| Prosecution: | Judge, this is not my witness. |
| Court: | Okay. |
| Prosecution: | Judge, I would contend that if this witness who was living with the defendant at this time will testify that she is aware of his PCP activity, it is certainly extremely probative to show intent, knowledge, absen[ce] of mistake or accident, which is the defendant's defense here. |

Court:    Okay.

- - - - -

Prosecution:    We can voir dire her, Your Honor, if the Court wants to inquire first as to what personal knowledge she might have of the PCP.

Court:    I think that really is the issue. As I look at it, Mr. Pyle [defense counsel], I'm looking under 404(b), it's the right section, but it isn't [the prosecution's] witness, and so the government does have the obligation in a criminal case to provide a reasonable notice in advance of trial, but in this circumstance, where it's not his witness and where there was no — she wasn't on the witness list at the time that we chose the jury, he could not have responsibility for having given advance notice when he didn't know the witness would ever be called.

- - - - -

Court:    I think given [Foster's] denial and the question of whether or not the drugs in the car [were] his, and so forth, and whether they were — I think it would go to opportunity or intent or knowledge, or a number of those kinds of things, under 404(b), but I think there is a prejudice that if the question is asked and she gives a "no" answer, there could be — that could taint. So I would agree that depending on what the response is — and so maybe we should get that answer outside of the jury.

J.A. at 185-88 (Trial Tr.).

At this point, the district court determined that a voir dire of Glover was necessary to determine what she would say in response to the question about whether she had ever seen Foster sell PCP. The court noted the following at the outset:

Before you ask the question on voir dire, let me be clear for the record, to the extent that there was also arguably an objection under 403, I just wanted to be clear that I was addressing that, as well. Rule 403 says that, "although relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Here the argument by the defendant is, and would be, unfair prejudice. However, the Court finds that the evidence should not be excluded because I don't find the probative value is substantially outweighed by the danger of unfair prejudice. Here the probative value is very high in the context of a case like this where there are disputed issues and facts about ownership of a car, about, therefore, whether the things in the car, drugs and gun, were those of the defendant, and so it would go to intent, motive, plan, design, those kinds of issues. So I would overrule the objection on that ground, as well. What I've decided to do is allow the parties to voir dire the witness on this issue and then make a determination as to how we will proceed at trial in light of answers given.

J.A. at 189-90 (Trial Tr.).

During the subsequent voir dire, Glover stated that she had never seen Foster possess or distribute PCP. The government proceeded to impeach Glover's denials with excerpts from a written statement she had made about three weeks after Foster's arrest. In the statement, she said that she observed Higgins remove vials of PCP from the vehicle in question.

She "observed this from the doorway of [her] house and saw the officers hold up two tubes about three inches high." J.A. at 191 (Trial Tr.). She continued: "I know this because I guess that Derrick Foster sells the PCP. He dips the Newport cigarettes in the PCP and sells them that way." J.A. at 191 (Trial Tr.). She also said in this statement that she "kn[ew] Derrick Foster m[ade] money dealing with PCP." J.A. at 192 (Trial Tr.). Although she admitted that the statement she made was accurately written down, she claimed that she made these statements "out of anger," and that her statement was false. J.A. at 191-92 (Trial Tr.).

After the prosecution finished its questioning, the judge asked both parties their positions as to how to proceed. The prosecution felt it was entitled to ask the questions, so that the jury could "assess the validity of [] [Glover]'s denials." J.A. at 194 (Trial Tr.). The defense characterized the situation as a "403 problem," expressing concern over the jury's ability to use the evidence solely for impeachment purposes, and not substantively, concluding therefore that the prejudice to Foster would be "overwhelming."[10] J.A. at 194 (Trial Tr.). The court, calling the situation a "difficult dilemma," made the following determination:

> [Glover]'s clearly made a statement that she knows that he deals in PCP or makes money dealing with PCP, and there are no facts and circumstances developed in the statement, and that's not a criticism of the statement, but there are no facts and circumstances. And that clearly would have no problem if there were facts and circumstances in it, to be honest with you, because, you know, the fact she denies it now is just that, a denial, but she said it before. And so — Mr. Schmitz [the prosecution], let me see those — I think there were two

---

[10] The defense did not renew its Rule 404(b) objection at any time after the voir dire of Glover.

places there in the statement where she talks about that. One was earlier and one was right at the end.

> (Discussion off the record).

> I don't think that the defendant can call this witness and then kind of hide behind her making denials at trial of things she said in a prior statement. The concern I have has more to do with specificity of the statement. But she clearly says that she knows that he deals, makes money from dealing in PCP. She's going to deny that's the case now, she's also given us her answer as to why she said what she said. And I think that what I should do, and will do, is allow full development of the testimony.

J.A. at 194-95 (Trial Tr.). In conclusion, the judge permitted Glover's impeachment, as he determined that Glover "ha[d] some impeachment material." J.A. at 197 (Trial Tr.). However, due to the concern expressed by defense counsel that the jury would consider this testimony for its truth, and not purely for impeachment purposes, the judge administered a limiting instruction at the time the jury was given pre-deliberation instructions.[11] Before being read to the jury, however, the instruction was read to counsel for both the government and Foster, both of whom expressed approval of the wording.

---

[11] The instruction read:
Now, during the course of this trial you have heard the testimony of several witnesses. You have also heard that before this trial, some of them made statements that may be different from their testimony here in court. Those earlier statements were brought to your attention only to help you decide how believable their in-court testimony was. You cannot use them as proof of anything else. You can only use those earlier statements as one way of evaluating their testimony here in court.
J.A. at 209 (Trial Tr.).

### 1. Rule 404(b) Objection

Foster contends that the district court erred when it permitted Glover's previous statement to come in, as this evidence violated Rule 404(b) because it constituted "other acts" evidence that did not fall within one of the enumerated exceptions. At the outset, we note that this case is made rather complicated because of the ambiguity contained in the record, in that it is not entirely clear on what ground the district court relied in admitting Glover's prior inconsistent statement. However, we do not believe that this is a situation in which Rule 404(b) applies at all.

Federal Rule of Evidence 404(b) states that

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed. R. Evid. 404(b). As the rule makes clear, introduction of evidence that Foster had previously sold drugs would be inadmissible simply to create the inference that because he sold drugs in the past, he was guilty of doing it in the present case. Therefore, if Glover's previous statement was within the scope of Rule 404(b), it could only be admitted if it fell within the scope of an exception, *e.g.*, to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." These exceptions are illustrative and not exclusive. *See United States v. Hardy*, 228 F.3d 745, 750 (6th Cir. 2000).

The government impeached Glover using her prior inconsistent statement to demonstrate that she was contradicting herself, and therefore that her testimony should be called into doubt by the jury for that reason. The purpose was not, nor could it be, to demonstrate that Foster was acting in conformity with his prior bad acts or character. Showing that Glover was being inconsistent demonstrates nothing more than that - her inconsistency with regard to whether or not she had seen Foster sell drugs in the past. Accordingly, Rule 404(b) is not triggered.

Glover's prior inconsistent statement is admissible under Federal Rule of Evidence 613(b), which permits the impeachment of a witness by "[e]xtrinsic evidence of a prior inconsistent statement" if "the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon . . . ." In the instant case, it is clear that Glover was properly impeached by her prior statement, as it directly contradicted the statement she made on the stand. Accordingly, the district court did not abuse its discretion in permitting this impeachment. We have permitted the impeachment of a witness, even when the impeaching material involves "other acts" of the defendant. *See, e.g., United States v. Gholston*, 10 F.3d 384, 388 (6th Cir. 1993) (after taking stand and denying having made such statement, witness impeached by his prior statement that he sold drugs for, or received drugs from, the defendant).

### 2. Rule 403 Objection

Foster also asserts that pursuant to Federal Rule of Evidence 403, the district court erred by letting the government impeach Glover with her prior inconsistent statement, because the probative value of that evidence was outweighed by the unfair prejudice caused by its introduction.

Federal Rule of Evidence 403 states that even relevant "evidence may be excluded if its probative value is

substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. The district court considered Rule 403 when it made its decision to allow the government to go forth with its impeachment of Glover, making the following comments:

> Here the argument by the defendant is, and would be, unfair prejudice. However, the Court finds that the evidence should not be excluded because I don't find the probative value is substantially outweighed by the danger of unfair prejudice. Here the probative value is very high in the context of a case like this where there are disputed issues and facts about ownership of a car, about, therefore, whether the things in the car, drugs and gun, were those of the defendant . . . .

J.A. at 189 (Trial Tr.).

A trial court's Rule 403 determination is reviewed for abuse of discretion. *United States v. Gibbs*, 182 F.3d 408, 429 (6th Cir. 1999), *cert. denied*, 528 U.S. 1051 (1999). "Under such a standard of review, this court takes maximal view of the probative effect of the evidence and a minimal view of its unfairly prejudicial effect, and will hold that the district court erred only if the latter outweighs the former." *United States v. Sassanelli*, 118 F.3d 495, 498 (6th Cir. 1997).

The district court did not commit an abuse of discretion when it determined that the probative value of the evidence was not outweighed by its unfairly prejudicial effect, and permitted the jury to weigh the credibility of Glover's direct testimony, that she had never seen Foster possess or distribute PCP, armed with the knowledge of her prior inconsistent statement, that "Foster sells the PCP." J.A. at 191 (Trial Tr.). We also note that the district court gave a limiting instruction to the jury regarding the appropriate use of the impeachment

evidence,[12] thereby limiting any possible unfair prejudice Foster feared from the jury's improper use of the testimony. "A crucial assumption underlying th[e] system [of trial by jury] is that juries will follow the instructions given them by the trial judge." *Parker v. Randolph*, 442 U.S. 62, 73 (1979); *see also Morgan v. Shirley*, 958 F.2d 662, 668 (6th Cir. 1992) (relying on *Randolph* assumption). Accordingly, the district court did not abuse its discretion in its Rule 403 determination.

## C. Ineffective Assistance of Counsel

Foster asserts that he was denied the effective assistance of counsel at trial because his attorney called Glover as a witness, who then gave testimony on cross-examination that Foster had previously sold PCP. Foster alleges that this demonstrates that "[e]ither counsel did not fully prepare and thus unwittingly placed [Glover] on the stand, or, knowing that she had given a prior damaging statement, he ran an unreasonable risk that it would not be revealed during cross-examination." Appellant's Br. at 32. Foster also criticizes his counsel's "fail[ure] to request a limiting instruction to the jury to at least attempt to minimize the damage" allegedly caused by Glover's testimony. Appellant's Br. at 32.

> Generally, this court will not review an ineffective assistance of counsel claim raised for the first time on direct appeal because the record has not been sufficiently developed for assessing the merits of the allegation. However, if the record has been sufficiently developed to allow this court to evaluate counsel's performance, this

---

[12]Foster criticizes the district court because "having admitted the evidence, [it] failed to instruct the jury whatsoever as to how it may use the evidence." Appellant's Br. at 30. However, as demonstrated above, the court gave the jury a limiting instruction before it retired to deliberate that was approved by both parties. Hence, there is no merit to this argument.

court will consider the ineffective assistance claim even though it was not raised at the district court.

*United States v. Goodlett*, 3 F.3d 976, 979 (6th Cir. 1993). *See also United States v. Snow*, 48 F.3d 198, 199 (6th Cir. 1995).

Because the record is inadequate for appellate review, we do not decide whether Foster's counsel was ineffective at trial. "Ineffective assistance of counsel claims are best brought by a defendant in a post-conviction proceeding under 28 U.S.C. § 2255 so that the parties can develop an adequate record on the issue." *United States v. Daniel*, 956 F.2d 540, 543 (6th Cir. 1992); *see also Massaro v. United States*, 123 S. Ct. 1690, 1694 (2003) (ineffective-assistance-of-counsel claims may and should be brought in 28 U.S.C. § 2255 proceeding).

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of Foster's motion to suppress and its decision to permit impeachment of Glover. As for the ineffective-assistance-of-counsel claim, we do not address it, as the record is inadequate for appellate review.