IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 27, 2024 Session

## DANIEL WARD v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Campbell County**
**No. 107000   Zachary R. Walden, Judge**

_____

### No. E2023-01024-CCA-R3-PC
_____

Petitioner, Daniel Ward, was convicted of ten counts of aggravated sexual battery. The trial court sentenced Petitioner to fifty-four years of incarceration, and this court affirmed his convictions on direct appeal. Petitioner then filed a petition for post-conviction relief, claiming ineffective assistance of counsel and cumulative error. The post-conviction court denied the petition after a hearing, and Petitioner now timely appeals. After review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JOHN W. CAMPBELL, SR., JJ., joined.

Gregory Paul Isaacs, Knoxville, Tennessee, for the appellant, Daniel Ward.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Jared R. Effler, District Attorney General; and David Pollard, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I. FACTS AND PROCEDURAL HISTORY

### A. Trial

On direct appeal, this court summarized the facts presented at Petitioner's June 2011 trial:

The convictions in this case are the result of events involving [Petitioner] and his wife's niece, C.M.[1]  At trial, C.M. testified that [Petitioner] was married to her aunt, Melissa, whom she called "Sissy." C.M. said that she visited the couple's residence during her free time to help her aunt, who was confined to a hospital bed as a result of her battle with lupus and "couldn't do anything for herself."  She recalled that on one occasion just before Christmas when she was 10 years old and in the fourth grade, [Petitioner] touched her "breast area and . . . private area" over her clothes while showing her how to use the computer.  She said that [Petitioner] told her "that it should . . . be kept between" the two of them.

C.M. testified that just before her 11th birthday and when she was in the fourth grade, her aunt asked her to help with the laundry, and [Petitioner] touched her breasts and vaginal area over her clothes while she was in the laundry room getting clothes out of the dryer.  C.M. recalled that on a Friday evening when she was in the fourth grade, she complained to her aunt that she felt ill, and her aunt suggested that she go to the grocery store with [Petitioner] to see if she could find any food that appealed to her.  C.M. said that she agreed, and [Petitioner] touched her vaginal area over her clothes as he drove to the store.  On another occasion when she was in the fourth grade, [Petitioner] touched her breasts and vaginal area over her clothes while she talked to a friend on the telephone.  She said that she ended her conversation and then pushed the [Petitioner's] hand away.  She told [Petitioner] no, and he said, "[J]ust this one time."

C.M. testified that during the summer after she completed fourth grade, she planned to go camping with her family for her brother's birthday, which was in June.  She said that her aunt became angry because she did not want C.M. to leave.  C.M. said that when she went into the living room to wait for her parents, [Petitioner] followed and joined her on the couch.  She

---

[1] In keeping with the policy of this court, we will refer to the minor victim using her initials.

recalled that as they sat talking, [Petitioner] touched her vaginal area over her clothes while rubbing his penis through his pants.

C.M. testified that when she was in the fifth grade and 12 years old, she was on the computer attempting to send an email to her brother when [Petitioner] sat down beside her and "started touching [her] breasts and [her] vagina." The victim said that on another occasion when she was in the fifth grade and just after she had started wearing a bra, [Petitioner] touched her breasts and "tried to go up under [her] shirt under [her] bra." She recalled that [Petitioner] did not actually touch her skin because she "got up and left." The victim testified about another incident that occurred when she was in fifth grade. She said that when [Petitioner] returned from an evening of hunting, he "grabbed [her] hand and tried to make [her] touch his penis." She said that she jerked her hand away and did not touch his penis. The victim testified that during the summer following fifth grade, she was cleaning her aunt's house in preparation for a sleepover with her friend when [Petitioner] came behind her and rubbed her breasts and vaginal area over her clothes. C.M. testified that [Petitioner] last attempted to touch her breasts just after her 16th birthday. She said that as he passed her in the dining room, he tried to touch her breast and vagina, but she batted his hand away.

C.M. said that she did not report the abuse to her aunt because she feared that the stress of such a revelation would compromise her aunt's already fragile health. After her aunt died, the victim told her best friend about the abuse. She was in the 10th grade. C.M. said that she then told her grandmother, who contacted police.

During cross-examination, C.M. acknowledged that she related only two incidences of touching during her forensic interview and that she gave another statement saying that all the incidences of touching were confined to [Petitioner's] house. She admitted that she did not provide a final statement relating all the alleged incidences of abuse until after [Petitioner] had been indicted. C.M. conceded that she was similar in size to her aunt and that she often wore her aunt's clothing when she visited. C.M. maintained that [Petitioner] did not ever touch her while she was in bed with her aunt. C.M. denied that she made the allegations because she was angry with [Petitioner] for remarrying.

Don Farmer, former Chief Deputy for the Campbell County Sheriff's Department, testified that he telephoned [Petitioner], who was at that time working as a deputy sheriff, and asked him to come to the jail at the request

of Tennessee Bureau of Investigation ("TBI") Agent Steve Vinsant. Deputy Farmer said that after [Petitioner] arrived, Deputy Farmer escorted him to the "officer's room" of the jail, where Agent Vinsant was waiting. Deputy Farmer said that he stayed for only a few minutes at the beginning of the [Petitioner's] interview and then left. He testified that when he returned later, he observed Agent Vinsant read to [Petitioner] a handwritten statement prepared by Agent Vinsant. Deputy Farmer said that [Petitioner] agreed that the statement was his and, after signing the statement, turned to Deputy Farmer and said, "'Well, Don, everybody makes a mistake.'"

TBI Agent Steve Vinsant testified that he provided *Miranda* warnings to [Petitioner] and that [Petitioner] signed a written waiver of his constitutional rights. Agent Vinsant said that after waiving his rights, [Petitioner] gave a statement that Agent Vinsant wrote down. Agent Vinsant said that after transcribing the statement, he read the statement aloud to [Petitioner], who then adopted it as his own by signing it. Agent Vinsant read the statement to the jury:

> My name is Daniel Ward. I live at 596 Chambers Road, Apartment 4 in Jacksboro, Tennessee. The first time I ever touched [C.M.'s] vagina and breasts, she was about 11 years old. From the first time until the last time, which was in January or February of this year, I touched her on the vagina and breasts at least 12 times. I did this because I was frustrated. I could not have sex with my wife. When [C.M.] says that I touched her vagina and breasts, that is true. It is not true that I masturbated in front of her. She may have walked into my spare bedroom and seen me masturbating and I did not know it. I never had sex with [C.M.]. I never penetrated her with my finger. I have never seen her naked.

> I gave [C.M.] money for doing chores, not for letting me touch her. [C.M.] would not say anything when I would touch her. When I talked to [C.M.] on the phone, I knew it was being recorded. When I told her that I did not know why I did it and that sometimes people make mistakes, I knew she was talking about when I would touch her.

Agent Vinsant testified that he recorded two telephone calls between C.M. and [Petitioner]. The second of those recorded conversations was

played for the jury. During that conversation, [Petitioner] told C.M. that "everybody makes mistakes."

During cross-examination, Agent Vinsant admitted that [Petitioner] told him "of one incident where he jumped into bed and mistook [C.M.] for his wife." Agent Vinsant said that that incident was not included in the written statement because [Petitioner] mentioned it at the beginning of the interview and did not bring it up again. Agent Vinsant denied picking and choosing details to include in the statement and said that he gave [Petitioner] the option of writing his own statement. Agent Vinsant maintained that the [Petitioner's] statement did not refer to the [Petitioner's] claim of "mistaken identity."

At the conclusion of Agent Vinsant's testimony, the State rested. . . . The trial court granted the [Petitioner's] motion to dismiss counts 11, 12, 13, 14, and 16 and modified count 15 to a charge of attempted sexual battery. The court declined to dismiss the remaining counts.

[Petitioner] testified that he was married to C.M.'s aunt Melissa for 13 years before she died on May 8, 2009, from lupus and related medical problems. [Petitioner] said that although Melissa's medical condition confined her to bed for "certain times," she was not completely bedridden and cared for herself while he worked. He said that although she occasionally slept in a hospital bed that they had purchased following a surgery, his wife slept in the marital bed "the biggest part of the 13 years we was together." [Petitioner] said that C.M. visited the couple's home because she liked staying there. [Petitioner] acknowledged that C.M. helped care for her aunt when she visited.

[Petitioner] testified that during one of those overnight visits, he returned home from work late, got into the bed, and began touching C.M. on her breast and vaginal area, believing her to be his wife. [Petitioner] said that it was dark, that C.M. was wearing his wife's clothes, and that he did not know that C.M. was visiting on that night. [Petitioner] admitted that he touched C.M. approximately 12 times before he realized it was not his wife. He testified that after he realized he had been touching C.M., he got out of bed and went to sleep on the couch. [Petitioner] denied touching C.M. on any other occasion.

[Petitioner] maintained that he did not tell Agent Vinsant that he was sexually frustrated and insisted that he and his wife had a normal sex life

until shortly before her death. He said that he provided the statement to Agent Vinsant because, as a police officer himself, he wanted to assist in their investigation. [Petitioner] said that he signed the statement written by Agent Vinsant because he "trusted that" the statement referred to the incident of mistaken identity and was not an admission of 10 to 12 separate incidences of touching.

[Petitioner] testified that when he told C.M. that "people make mistakes," he was "referring to the night" that he mistook C.M. for his wife and not to years of sexual abuse. [Petitioner] said that C.M. only came forward with the allegations after finding out that his girlfriend, whom he had married prior to trial, was pregnant in November 2009.

During cross-examination, [Petitioner] denied telling Agent Vinsant that he started touching C.M. when she was 11. [Petitioner] said that he did not recall the statements being read to him. He insisted that parts of the written statement had been fabricated by Agent Vinsant.

At the conclusion of the [Petitioner's] testimony, the defense rested. The jury convicted [Petitioner] as charged of aggravated sexual battery in counts one through 10 but acquitted him of the charge of attempted sexual battery in count 15.

*State v. Ward*, No. E2012-01419-CCA-R3-CD, 2013 WL 4767189, at *1-*4 (Tenn. Crim. App. Sept. 4, 2013) (alterations added), *perm. app. denied* (Feb. 11, 2014).

Following a sentencing hearing, the trial court imposed sentences of nine years for each individual conviction. *Id.* at *9. The trial court further ordered six of the sentences to be served consecutively, and the remaining four concurrently, for a total effective sentence of fifty-four years' imprisonment. *Id.* at *11.

After Petitioner appealed his convictions and sentences to this court, we affirmed nine of Petitioner's ten convictions and his fifty-four-year effective sentence. *Id.* at *11. Petitioner filed an application for permission to appeal to our supreme court, which was denied on February 11, 2014.

Petitioner filed a petition for post-conviction relief on February 6, 2015, and an amended petition on April 25, 2016, alleging ineffective assistance of counsel and cumulative error. After Petitioner filed his amended petition, but before the State filed a response, trial counsel, who also represented Petitioner in his direct appeal, ("Counsel") was disbarred and incarcerated for reasons unrelated to his representation of Petitioner.

The State filed a response on April 19, 2019, and an evidentiary hearing was scheduled for early 2020. However, the hearing was continued until June 8, 2021, due to the COVID-19 pandemic and multiple transportation issues while both Petitioner and Counsel were incarcerated.

## B. Post-Conviction Hearing

An evidentiary hearing was held on June 8, 2021, and resumed on April 14, 2023. Multiple events caused the delay between the first and second day of the hearing. Before the June 8, 2021 hearing, Counsel did not have access to Petitioner's file, and at the hearing Counsel was unable to recall the details of his trial preparation or the trial itself. The post-conviction court continued the hearing to allow Counsel to obtain and review his file so that he could refresh his recollection. The hearing subsequently was continued again to give more time to review Petitioner's file. After the continuances, the judge who conducted Petitioner's trial and the June 2021 hearing retired in June 2022. Counsel died in December 2022 before the hearing could resume.[2]

On the first day of the hearing, Counsel testified that he attended Duke University, graduated from the University of Tennessee Law School, was licensed to practice law in 1991, and practiced law for twenty-five years. He estimated that sixty percent of his practice involved criminal defense, and he had conducted fifteen or sixteen criminal jury trials. Those trials included defendants charged with felonies such as homicide and sexual abuse. Counsel recalled that Petitioner had been charged with "multiple counts of aggravated sexual battery." He stated that Petitioner "had a high school diploma" and that, to the best of Counsel's recollection, Petitioner was "employed as a Campbell County sheriff's deputy." After these initial questions, it became clear that Counsel did not have an independent recollection of the details of his representation of Petitioner. Counsel stated that he had not seen Petitioner's file in more than eight years, and he did not know where the file was currently located. Petitioner's post-conviction counsel indicated that he had a copy of the file at his office and could make the file available for Counsel to review. The post-conviction court continued the hearing for that purpose, but as previously stated, Counsel died before giving any additional testimony in Petitioner's case.

The hearing resumed on April 14, 2023. Petitioner testified that he graduated from high school in 1992. He then worked for the City of Jacksboro Fire Department where he "went through a lot of courses." In 1999, Petitioner was hired by the Campbell County

---

[2] Neither party objected nor claimed prejudice because of the delay. In its order denying the petition, the post-conviction court noted that it was serving as the "successor judge" in this case because "the initial evidentiary hearing on June 8, 2021, was presided over by Judge E. Shayne Sexton, who retired on June 30, 2022." The court further noted that "due to the death of [Counsel] who testified at the June 8, 2021 hearing, this court considered the transcript of that hearing."

Sheriff's Department, where he worked in the jail and "went through some training." In 2008, Petitioner became a certified police officer after he "went to the police academy in Nashville."

Petitioner testified he had a "good relationship" with the victim who "stayed with [Petitioner and his wife] quite often and never had any kind of issues." Petitioner stated that he was never informed of any problems or complaints concerning his relationship with the victim before she made the allegations that led to his criminal charges.

Petitioner hired Counsel before he was indicted.[3] Petitioner alleged Counsel spent "about [fifteen] minutes" reviewing the State's discovery and evidence with Petitioner over the course of Counsel's many years representing Petitioner. Petitioner did acknowledge, however, that Counsel provided him with copies of the discovery materials. In the discovery materials were "copies of CD's," including the recorded telephone calls between Petitioner and the victim. Petitioner recalled asking Counsel to interview four potential witnesses who Petitioner said could have testified about the victim's demeanor before and after staying with Petitioner and about the interactions between the victim and Petitioner. The potential witnesses included A.M., who was the victim's brother, Matthew Morgan, who was Petitioner's former father-in-law, Brenda Carden, and Detective Jamie Hall. Petitioner was unaware of whether Counsel ever interviewed those people.

Petitioner then discussed his interactions with TBI Agent Vinsant and Captain Farmer from the Campbell County Sheriff's Department. Petitioner conceded that he received two *Miranda* warnings during the interviews. He explained that he was on duty when Captain Farmer asked him to report to the "officer's room." Agent Vinsant then read Petitioner's *Miranda* rights and began asking Petitioner questions. Petitioner testified that he told Agent Vinsant about one night when he came home and got into his bed after working a double shift. According to Petitioner, while in the bed he shared with his wife, he touched whom he thought was his wife but was actually the victim. Petitioner testified that this case of mistaken identity was the only time he inappropriately touched the victim. He denied subjecting the victim to years of sexual abuse.

After Petitioner told them about this incident, "they stopped" the interrogation, and he was ushered into another room with an agent whose name he could not recall. Petitioner then received a second *Miranda* waiver form and estimated "[twenty-eight] minutes [passed] between when [he] signed the first waiver and the second one." Petitioner believed that both of his statements had been recorded, but he had not seen copies of the recordings, nor was he aware of whether Counsel obtained copies. Petitioner admitted he knew the agent had reduced his second statement to writing and that Petitioner had initialed

---

[3] The record reflects Petitioner was indicted in January 2010.

the written statement. Petitioner testified, however, that he could not recall whether the agent ever read the statement to him. According to Petitioner, the first statement he gave was true, but the second statement was false. He therefore asked Counsel to file a motion to suppress the second statement as well as the phone calls between himself and the victim. Petitioner alleged that Counsel spent "five minutes at the most" interviewing Petitioner to obtain information to file the motion to suppress, and he was unaware whether Counsel requested a hearing on the motion.

After the motion to suppress,[4] Petitioner testified that the next time Counsel contacted him was in February 2011 to "sign a plea deal," in which the State offered for Petitioner to serve twenty years at a service rate of thirty percent. According to Petitioner, Counsel assured him that he would be "paroled out in six years" if he accepted the State's offer. Petitioner admitted he had initially signed the plea agreement, but he ultimately declined to plead guilty and "wanted a trial." Petitioner testified that this was a major point of contention between himself and Counsel. The following week, Petitioner learned that his trial date had been set, so he went to Counsel's office and told him again that he did not want to take the plea deal. Counsel told Petitioner to go to the courthouse and the next time Petitioner, who was then free on bond, saw Counsel was in the courtroom when the case was set for trial.

Petitioner's recollection was that Counsel spent between fifteen and thirty minutes preparing him for trial. Petitioner said he could not "recall" whether Counsel explained direct or cross-examination to him, or if Counsel reviewed the questions, he would ask Petitioner when he testified. Petitioner said, "The only thing I recall him telling me about the testifying . . . [Counsel] told me to look at the jury when I answered questions." Petitioner assumed Counsel would call witnesses to testify on Petitioner's behalf, but "nobody testified" on his behalf other than himself. Petitioner said in his opinion, he did not think Counsel "was prepared at all." Petitioner said that during the two days of trial, Counsel did not meet with Petitioner and the only time they were together was when Petitioner "was sitting at the table." Petitioner also said that Counsel did not discuss with him the two statements Petitioner gave to law enforcement or tell him that the State would likely ask Petitioner about his recorded phone conversations with the victim. After Petitioner was convicted, Counsel visited him in jail and told him his sentence would likely be "somewhere around [eighteen] years." Petitioner admitted he had filed a complaint against Counsel with the Board of Professional Responsibility.

On cross-examination, Petitioner discussed the two *Miranda* waivers and confirmed that he signed them during his interviews with law enforcement. Petitioner admitted that

---

[4] The record reflects that Petitioner did sign a proposed plea agreement with the State on February 22, 2011, but the motion to suppress was not filed until May 18, 2011.

Counsel had successfully moved the trial court to continue Petitioner's trial because Petitioner and his wife were expecting a child. Petitioner also acknowledged that Counsel had filed a motion to suppress the recorded phone calls and Petitioner's written statement, but claimed he did not know Counsel successfully persuaded the trial court to suppress one of the phone calls. Petitioner conceded that Counsel had demanded a bill of particulars, but Petitioner alleged that the prosecution had a different bill of particulars at trial than the one they provided to Counsel pre-trial. Petitioner then testified he struggled with reading and writing. Ultimately, Petitioner said that if Counsel "would have did his job," Petitioner "would've had a better chance at trial."

Petitioner presented no other witnesses at the post-conviction hearing.

Subsequently, the post-conviction court entered a written order and a supplemental written order denying Petitioner's petition for post-conviction relief, finding that Petitioner had failed to prove at least one of the prongs of the *Strickland* standard for every alleged instance of ineffective assistance of counsel. Petitioner timely appealed the judgment of the post-conviction court.

## II. ANALYSIS

### A. Post-Conviction Standard of Review

To obtain post-conviction relief, a petitioner must establish his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. A petitioner bears the burden of proving the factual allegations contained in the petition by clear and convincing evidence. *Id.* § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 296 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Appellate courts do not reassess the post-conviction court's determination of the credibility of witnesses. *Dellinger*, 279 S.W.3d at 292 (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Assessing the credibility of witnesses is a matter entrusted to the post-conviction judge as the trier of fact. *R.D.S.*, 245 S.W.3d at 362 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). On appeal, a post-conviction court's factual findings will not be disturbed unless the evidence contained in the record preponderates against the findings. *Brooks v. State*, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988); *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). On the other hand, conclusions of law are given no presumption of correctness on appeal. *Dellinger*, 279

S.W.3d at 293; *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001). We review "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013) (first citing *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011); and then citing *Calvert v. State*, 342 S.W.3d 477, 485 (Tenn. 2011)).

## B. Ineffective Assistance of Counsel

In this appeal, Petitioner asserts that he received ineffective assistance of counsel at trial and on direct appeal.[5] Petitioner contends Counsel was ineffective because he (1) engaged in a pretrial motion practice which significantly departed from the standard of a reasonable attorney; (2) failed to move for a mistrial or a curative instruction after the jury was exposed to highly prejudicial and inadmissible statements; (3) failed to object to the State's improper vouching for witness credibility during its closing argument; (4) failed to properly investigate and prepare for trial; and (5) failed to challenge on appeal the admission of the highly prejudicial second recorded phone call between Petitioner and the victim. We will address each of Petitioner's contentions in turn.

Both the United States Constitution and the Constitution of the State of Tennessee guarantee criminal defendants the right to effective assistance of counsel. U.S. Const. amend VI; Tenn. Const. art. I, § 9. Under the Sixth Amendment to the United States Constitution, when a petitioner raises an ineffective assistance of counsel claim, the burden is on the petitioner to show both (1) counsel's performance was deficient and (2) the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). To prevail on such a claim, a petitioner must prove both prongs of the *Strickland* test, and failure to prove either is "a sufficient basis to deny relief on the claim." *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). "[A] court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996).

To prove that counsel's performance was deficient, a petitioner must establish that his attorney's conduct fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. As our supreme court has held:

---

[5] As noted previously, Counsel also represented Petitioner in his direct appeal.

[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

*Finch v. State*, 226 S.W.3d 307, 315-16 (Tenn. 2007) (quoting *Baxter v. Rose*, 523 S.W.2d 930, 934-35 (Tenn. 1975)). A reviewing "court may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation." *Alley v. State*, 958 S.W.2d 138, 149 (Tenn. Crim. App. 1997) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). A reviewing court also cannot criticize a sound, but unsuccessful, tactical decision made during the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994).

To prove prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* As such, a petitioner must establish that his or her attorney's deficient performance was of such magnitude that he was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *Burns*, 6 S.W.3d at 463).

1. Suppression of Petitioner's Statements to Law Enforcement

Petitioner argues that Counsel was ineffective because "trial counsel's pretrial motion practice significantly departed from the standard of a reasonable attorney." In support of this argument, Petitioner first asserts that Counsel's motion to suppress Petitioner's custodial statement was "insufficient" because it did not reference any specific legal authority or contain sufficient facts. We disagree.

Initially, we observe that Petitioner claims the post-conviction court found that Counsel's failure to file a proper motion to suppress Petitioner's written statement was deficient performance. The portion of the post-conviction court's order addressing Counsel's motion to suppress reads as follows:

It is clear from the testimony at the April 14 hearing and from the trial record that the Motion to Suppress the written statement contained no reference to any specific legal standard. A court need not address both the first and second prong if the petitioner makes an insufficient showing of one of the

- 12 -

prongs. [ ] The second prong of the analysis requires the petitioner to show a prejudicial outcome. Petitioner does not show the prejudicial outcome either at trial or in the petition; further, the Tennessee Court of Criminal Appeals considered and decided that the trial court did not err in admitting the written statement. [*Ward*, 2013 WL 4767189, at \*8]. Petitioner's claim for ineffective assistance of counsel fails as it relates to the motion to suppress his written statement.

We disagree with Petitioner's interpretation of the post-conviction court's order. In our view, the post-conviction court recognized that if one prong of *Strickland* failed, the court did not need to address the other prong. The court specifically found Petitioner had not carried his burden of proving that he was prejudiced by Counsel's motion to suppress, and as such the trial court did not address the deficient performance prong.

Turning to Petitioner's assertions, the United States Supreme Court has held that when a petitioner's "principal allegation of ineffectiveness" is based on "counsel's failure to litigate a Fourth Amendment claim competently," the petitioner must establish "that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). Stated another way, our supreme court has explained,

> [T]o establish a successful claim of ineffective assistance of counsel based on counsel's failure to file a motion to suppress evidence on Fourth Amendment grounds, the Petitioner must prove: (1) a suppression motion would have been meritorious; (2) counsel's failure to file such motion was objectively unreasonable; and (3) but for counsel's objectively unreasonable omission, there is a reasonable probability that the verdict would have been different absent the excludable evidence.

*Phillips v. State*, 647 S.W.3d 389, 404 (Tenn. 2022) (internal quotations omitted).

Petitioner asserts that Counsel should have argued in the motion that the statement was inadmissible because Petitioner's *Miranda* rights were violated. However, even if Counsel's failure to do so constituted deficient performance, Petitioner cannot prove Counsel's actions were prejudicial. The record reflects that at the time of his interrogation, Petitioner executed two written waivers of his *Miranda* rights. Both forms, which were introduced as exhibits at the post-conviction hearing, list Petitioner's *Miranda* rights and bear his signature, indicating he had read his rights or that his rights were read to him. Petitioner argues that he failed to understand these forms because he reads at a third-grade level and has difficulty reading and writing. We agree with the State that the record does

not support Petitioner's argument. As stated below, Petitioner introduced no credible proof of any supposed reading deficiency during the post-conviction hearing, and perhaps more significantly, Petitioner was a certified police officer and had received training in *Miranda* before his arrest.

Additionally, as the post-conviction court correctly stated, on direct appeal this court determined that the trial court did not err in admitting Petitioner's statement. *See Ward*, 2013 WL at *8. Although on direct appeal Counsel did not argue that Petitioner's statement was obtained in violation of his constitutional rights, Counsel argued Petitioner's statement was involuntary—a claim this court rejected:

> The record establishes that [Petitioner] voluntarily submitted to the agent's questioning, arriving of his own accord at the jail, and that he signed a waiver of his rights before providing the statement. [Petitioner] acknowledges that the statement is at least partially his own and that he made most of the admissions contained therein to Agent Vinsant. His only argument is that the Agent misconstrued the nature of his admissions and that some of the admissions were inconsistent with other trial testimony. This claim, even if true, would not affect the voluntariness of the statement. Instead, the defendant's claim that the statement as written by Agent Vinsant did not accurately convey the precise meaning of his admissions and that those admissions were not consistent with some trial testimony would go to the weight of the statement as evidence rather than its admissibility.

*Id.* (alterations added).

In sum, Petitioner has failed to establish that a motion to suppress on *Miranda* grounds—or otherwise—would have been successful, or that such a suppression motion, had it been successful, would have created "a reasonable probability that the verdict would have been different." Thus, he cannot establish prejudice, and he has therefore failed to establish Counsel rendered ineffective assistance as to this issue.

### 2. Suppression of Petitioner's Call with the Victim

Petitioner also claims that Counsel was ineffective by "failing to properly file and argue the motion to suppress the second recorded phone call between [Petitioner] and [the victim]," in which Petitioner told the victim that "people make mistakes." It is undisputed that Counsel filed a motion to suppress the two recorded phone calls. It is also undisputed that Counsel was successful in getting one of the phone calls suppressed. According to Petitioner, however, Counsel should have argued that the second phone call was

"irrelevant" and "highly prejudicial," and should have been suppressed under Tennessee Rules of Evidence 401 and 403.

As an initial matter, Petitioner again argues that the post-conviction court agreed that Counsel was deficient in failing to file an adequate motion to suppress the phone call. The post-conviction court's order related to the motion to suppress the phone call reads as follows:

> It is clear from the testimony at the April 14 evidentiary hearing and from the trial record that the Motion to Suppress the recorded telephone calls contained no reference to any specific legal standard. Despite the lack of case or statutory authority contained in the motions, the court did suppress one of the two calls. As to the second prong of the Strickland test, Petitioner did not carry his burden and show that the admitted phone call was prejudicial to the point of an unjust outcome, that the admitted phone call should have been suppressed, and did not present evidence on this issue at the hearing.

Again, we agree with the State that the foregoing language does not support Petitioner's assertion that the trial court found the motion to suppress the second phone call deficient.

In our view, Counsel was not deficient for failing to argue the call should have been suppressed as irrelevant. In the call, Petitioner referred to touching the victim as a "mistake." Arguably, this comment could be construed as a confession; even if not rising to the level of a confession, this comment was clearly relevant under Tennessee Rule of Evidence 401, which defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Counsel was also not deficient for failing to argue the call should have been suppressed as unfairly prejudicial. The call was an admission of wrongdoing by Petitioner, and the probative value of that evidence far outweighed the potential for unfair prejudice that Petitioner now alleges the evidence presented. *See* Tenn. R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice"). Because the phone call was admissible under Rules 401 and 403, Counsel's choice not to challenge the admissibility of the evidence on these grounds did not constitute deficient performance.

Furthermore, we agree with the post-conviction court that Petitioner has failed to establish Counsel's actions prejudiced him. Petitioner asserts in his brief that "[t]he prejudice of this statement in a child sex case cannot be overstated." However, beyond this conclusory observation, Petitioner's brief offers little argument regarding the supposed

prejudice of Counsel's actions regarding this issue. The brief is certainly devoid of an explanation of how a different motion to suppress would have resulted in "a reasonable probability that the verdict would have been different." *See Phillips*, 647 S.W.3d at 404. Because Petitioner has failed to establish either deficient performance or prejudice, he is not entitled to relief on this issue.

### 3. Bill of Particulars

Petitioner next contends Counsel was ineffective for "filing a skeletal motion for a bill of particulars." Counsel filed a pretrial motion for a bill of particulars from the State, and in turn, the State filed a bill of particulars indicating the specific location of each incident and providing a date range more specific than indicated in the indictment for each offense. Petitioner also argues that Counsel was deficient because he did not "demand a detailed response from the State." We disagree.

The Tennessee Supreme Court has observed that in cases involving sexual crimes against a minor, a date range is acceptable if "it does not appear that the defendant's defense has been hampered by the lack of specificity." *State v. Speck*, 944 S.W.2d 598, 600 (Tenn. 1997) (quoting *State v. Byrd*, 820 S.W.2d 739, 741-42 (Tenn. 1991)). A "lack of specificity will not result in reversible error unless a defendant can prove prejudice." *State v. Sherman,* 266 S.W.3d 395, 409 (Tenn. 2008). In this post-conviction proceeding, Petitioner does not offer any defenses that he would have used at trial if specific dates or other additional information were set forth in the bill of particulars. Thus, Petitioner has not demonstrated how Counsel's performance was deficient.

Nor can Petitioner establish Counsel's actions prejudiced him. On direct appeal, this court concluded, "Even if the bill of particulars was inadequate, [Petitioner] has failed to establish that he was prejudiced by that inadequacy." *Ward*, 2013 WL 4767189, at *7. Petitioner's claim to this court that Counsel's lack of an objection to the bill of particulars constituted ineffective assistance of counsel fails for the same reason. In short, Petitioner has barely argued, and he certainly has not shown, how he was prejudiced by Counsel's acceptance of the bill of particulars provided by the State. Accordingly, Petitioner has not established Counsel rendered ineffective assistance as to this issue.

### 4. Motion for Mistrial or Request for a Curative Instruction

Petitioner next asserts Counsel was ineffective for not moving for a mistrial or requesting a curative instruction after the State asked the victim, "[d]id you—was there ever any pornography at—." Counsel immediately objected before the State could finish its question and a brief exchange occurred regarding whether the question was proper. The

trial court then removed the jury from the courtroom and sustained the objection while the jury was still out. We disagree with Petitioner's contention.

A mistrial is appropriate only when there is a manifest necessity for such action because an event has occurred that precludes an impartial verdict and a miscarriage of justice would result if the trial were to continue. *See State v. Jones*, 568 S.W.3d 101, 126 (Tenn. 2019) (citations omitted). Here, the trial court removed the jury from the courtroom before discussing the objection in depth, and the trial court ultimately sustained the objection. In sum, the witness did not answer the question about pornography because Counsel immediately objected to it, and the attorney's question is not evidence. *See Elliot v. Cobb*, 320 S.W.3d 246, 250 (Tenn. 2010); *Odom v. State*, No. W2015-01742-CCA-R3-PD, 2017 WL 4764908, at *36 (Tenn. Crim. App. Oct. 20, 2017); *Johnson v. State*, No. 02C01-9707-CR-00292, 1999 WL 608861, at *21 (Tenn. Crim. App. Aug. 12, 1999); *see also United States v. Gholston*, 10 F.3d 384, 389 (6th Cir. 1993). The jury only heard the word "pornography" as part of a question, and Petitioner has not cited any authority to suggest that hearing that word in this context "preclude[d] an impartial verdict." *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). We agree with the post-conviction court that Counsel's representation was not deficient for failing to move for a mistrial and that Petitioner was not prejudiced as a result.

Regarding whether Counsel was ineffective for not requesting a curative instruction, we note that the court did instruct the jury that "at times during the trial, I will rule upon the admissibility of evidence. You must not concern yourself with these rulings." "Juries are presumed to follow the trial court's instructions." *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). It is also possible that Counsel made a strategic decision to not request a curative instruction on this issue to prevent re-visiting the issue of pornography with the jury. As we have stated, we will not second-guess the reasonable trial tactics of Counsel. *Alley*, 958 S.W.2d at 149. We therefore conclude that Counsel was not deficient in declining to request a curative instruction regarding the question, nor has Petitioner presented proof establishing that Counsel's failure to seek a curative instruction prejudiced him. Consequently, Petitioner is not entitled to relief on this issue.

5. The State's Closing Argument

Petitioner next argues Counsel was ineffective for not objecting to what Petitioner deems "the State's improper vouching for witness credibility during its closing argument." Petitioner challenges several portions of the State's closing argument as impermissible expressions of a prosecutor's belief about a witness's credibility. According to Petitioner, Counsel's failure to lodge simultaneous objections to these statements constitutes ineffective assistance of counsel. We disagree.

- 17 -

Closing arguments are intended "to sharpen and to clarify the issues that must be resolved in a criminal case." *Banks*, 271 S.W.3d at 130. Prosecutors "may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence or make derogatory remarks or appeal to the jurors' prejudices." *Id.* at 131 (internal citations omitted). "A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Id.* Rather, "An improper closing argument will not constitute reversible error unless it is so inflammatory or improper" that the argument "affected the outcome of the trial to the defendant's prejudice." *Id.*; *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965). The Tennessee Supreme Court has set forth the following factors to consider in determining whether a defendant was prejudiced by improper statements from the State:

> (1) the conduct complained of viewed in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984) (quoting *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

The court has reviewed the State's closing argument from trial and concludes that the argument was not meant to inflame the passions of the jury and does not rise to the level of reversible error. Overall, the State's closing argument was temperate and focused on the facts of the case. Because the State's closing argument was not improper, Counsel cannot be deemed deficient for not raising meritless challenges to the argument. We also note, as did the post-conviction court, that Petitioner has failed to establish that Counsel's choice not to object was not a tactical decision. This court has acknowledged that "decisions of a trial attorney as to whether to object to opposing counsel's arguments are often primarily tactical decisions . . . . Trial counsel could have decided not to object for several valid reasons, including not wanting to emphasize the unfavorable statements." *Odom*, 2017 WL 4764908, at *36.

Nor has Petitioner established that Counsel's refusal to object prejudiced him. In its order denying relief, the post-conviction court found that "given that Petitioner offered a confession" to the offenses, the evidence against him "was so overwhelming that he suffered no prejudice" from the State's closing argument or Counsel's failure to object to it. In addition to the strength of the State's case, the propriety of the State's entire closing argument and the lack of other errors in the record also support the post-conviction court's

conclusion that the State's closing argument, and Counsel's choice not to object to it, did not prejudice Petitioner. Thus, Petitioner is not entitled to relief on this issue.

### 6. Investigation and Preparation for Trial

Petitioner argues Counsel was ineffective for failing to "properly investigate and prepare for trial." However, the only specific assertion related to this issue is Petitioner's contention that Counsel "failed to explore any defense related to [Petitioner's] mental acumen." Petitioner asserts that he "possessed a third[-]grade reading level" which "should have been discovered at the onset of trial counsel's representation of [Petitioner], while the State counters that no credible evidence exists in the record to support Petitioner's assertion.[6] We agree with the State.

At the post-conviction hearing, Petitioner called no expert witnesses regarding this issue and offered no testimony from other persons—expert or otherwise—to support Petitioner's claims regarding his purported mental deficiency. The sole testimony offered at the post-conviction hearing in support of this issue was Petitioner's self-serving testimony, and the post-conviction court concluded Petitioner was not a credible witness on the issue. And as the post-conviction court correctly recognized, it is Petitioner's burden to present evidence to support the issues raised in his post-conviction petition. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing."). Petitioner failed to call any other witnesses at the hearing.

Because Petitioner has not provided credible evidence supporting this claim, we cannot conclude Counsel's failure to raise the issue constituted deficient performance. Nor can we conclude that Petitioner was prejudiced by Counsel's failure to raise the issue before trial. Thus, Petitioner has failed to establish Counsel rendered ineffective assistance as to this issue.

### 7. Counsel's Failure to Raise Issue of Second Phone Call on Appeal

Petitioner next contends he received ineffective assistance of counsel on appeal due to Counsel's failure to challenge the admission of the second phone call between himself and the victim. We determine whether appellate counsel's representation was constitutionally effective using the same manner of review applied to ineffective assistance

---

[6] The record reflects that at the sentencing hearing, Counsel attempted to introduce a report detailing Petitioner's purported reading level, but over Counsel's objection the trial court excluded the report from consideration.

of counsel claims by trial counsel. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004). "[T]here is no constitutional requirement that an attorney argue every issue on appeal." *Campbell v. State*, 904 S.W.2d 594, 596-97 (Tenn. 1995). Rather, "[t]he determination of which issues to raise on appeal is generally within appellate counsel's sound discretion." *Carpenter*,126 S.W.3d at 887; *Porterfield v. State*, 897 S.W.2d 672, 678 (Tenn. 1995).

"If a claim of ineffective assistance of counsel is based on the failure to raise a particular issue . . . then the reviewing court must determine the merits of the issue." *Carpenter*, 126 S.W.3d at 887 (citing *Kimmelman*, 477 U.S. at 375). In *Carpenter*, our supreme court further said:

> Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim. *See United States v. Dixon*, 1 F.3d 1080, 1083 (10th Cir. 1993).

*Id.* at 887-88.

Earlier in this opinion, we concluded that Petitioner's claim that the second phone call should have been suppressed was without merit, and thus Counsel did not render ineffective assistance regarding this issue in the trial court. Because the issue was without merit, we conclude that Counsel's choice not to raise this issue on direct appeal neither constituted deficient performance nor prejudiced Petitioner. Accordingly, Petitioner has failed to prove Counsel was ineffective as to this issue.

### 8. Cumulative Error

Finally, Petitioner argues that even if this court concludes that none of the errors individually amount to ineffective assistance of counsel, the cumulative effect of these errors warrants relief. We disagree. The cumulative error doctrine recognizes that multiple small errors in trial proceedings may be harmless when considered in a vacuum, but the effect of all errors when aggregated deprived the defendant's right to a fair trial. *See State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010); *see also State v. Leath*, 461 S.W.3d 73, 116 (Tenn. Crim. App. 2013). However, because we have discerned no singular instance in which Counsel was ineffective, there can be no cumulative error. Accordingly, Petitioner is not entitled to relief on this issue.

### III. CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
MATTHEW J. WILSON, JUDGE